**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| METROPOLITAN CAPITAL ADVISORS INTERNATIONAL LTD. and JEFFREY E. SCHWARZ, derivatively on behalf of NAVIOS MARITIME ACQUISITION CORPORATION | Case No. _____ |
| | Judge: |
| Plaintiffs, | |
| v. | |
| NAVIOS MARITIME HOLDINGS, INC., | **JURY TRIAL DEMANDED** |
| Defendant, | |
| -and- | |
| NAVIOS MARITIME ACQUISITION CORPORATION, | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiffs Metropolitan Capital Advisors International Ltd. and Jeffrey E. Schwarz ("Plaintiffs"), by and through their undersigned counsel, bring this Verified Stockholder Derivative Complaint against Navios Maritime Holdings, Inc. ("Holdings") on behalf of nominal defendant Navios Maritime Acquisition Corporation ("Acquisition"). Plaintiffs allege the following based upon knowledge as to themselves, and upon information and belief, including the investigation of Plaintiff's counsel and review of publicly available information, as to all other matters. Plaintiffs hereby demand a trial by jury.

## NATURE OF THE ACTION

1.     This case presents a financially desperate corporate controller abusing its control over a subsidiary to give itself a financial bailout package, at the expense of the subsidiary and its public stockholders. Facing a liquidity crisis, a complete inability to access third party financing,

and a near-inevitable bankruptcy filing when its 2019 publicly traded notes come due, Holdings, the corporate controller, caused Acquisition, the controlled publicly traded subsidiary, to issue a $50 million loan facility on terms that no rational person, much less a corporate director or controlling stockholder showing respect to their fiduciary duties, would ever permit.

2.      As explained below, Holdings used to own 100% of Acquisition, and their boards are largely overlapping, starting with the Chairwoman of both entities, Greek shipping magnate Angeliki Frangou ("Frangou").  Since taking Acquisition partially public in 2008, Holdings has used securities warrants and stock issuances to veer both above and below the 50% equity ownership level.  Currently, 46.5% of Acquisition's equity is directly or indirectly controlled by Holdings and corporate insiders.  In light of current realities about stockholder voting practices, this amount gives Holdings absolute control over the outcome of any election of directors or other matter of Acquisition's business that may be put to a stockholder vote.

3.      Moreover, Holdings controls every aspect of Acquisition's business operations, including providing all internal services, pursuant to a series of management and operational agreements that have proven incredibly lucrative to Holdings while likely costing Acquisition more than hiring internal employees and managers would ever reasonably cost.  Between its ownership and day-to-day control over Acquisition, there is no doubt that Holdings is a controller that owes fiduciary duties to Acquisition and its public stockholders.

4.      Holdings, however, is facing a severe financial crisis.  Amidst a slowdown in the dry bulk shipping industry, Holdings is struggling to service its existing debt load, and cannot access the capital markets for liquidity.  Its unsecured debt is trading in the market at a staggering 58% yield, and even its secured debt is trading at a 31% yield.

5.      Desperate to gain liquidity, Holdings, led by Frangou, decided to use its absolute control over Acquisition to complete an unlawful and wholly absurd $50 million stripping of value from Acquisition in favor of Holdings.  Specifically, Holdings caused Acquisition to authorize a $50 million revolving credit facility in favor of Holdings that charges an unconscionably low interest rate that is currently 3.6% (the "Loan").  In light of Holdings' financial distress, no rational person or entity would lend money to Holdings on such one-sided and generous terms.  Put simply, no rational person or entity would ever extend this loan to Holdings unless the purpose was to benefit Holdings at Acquisition's expense.

6.      To be clear, Holdings was not, and is not, faced with a binary choice between causing Acquisition to provide this Loan or filing for bankruptcy.  While Holdings did not have the ability to tap the public debt markets, it could have raised new equity, either from its existing stockholders, including Frangou, or from third parties.  However, since such an equity raise would either be expensive or dilutive to Holdings' existing stockholder, Holdings instead chose to abuse its control over Acquisition for its own self-interests.

7.      Immediate judicial relief is necessary because the Acquisition board of directors is plainly favoring the interests of Holdings ahead of the interests of Acquisition itself, along with Acquisition's public stockholders.  Fortunately, there appears still to be time to achieve judicial relief before the full $50 million is actually transferred to Holdings.  In fact, with immediate injunctive relief, the Court may be able to enjoin any draw down of the $50 million Loan before Acquisition suffers the irreparable harm of providing funds to Holdings that will never be repaid, on terms that no sane person would ever offer to Holdings.

8.      To the extent that any or all of the $50 million has been drawn down by Holdings, then this action seeks recission of the loan, and either disgorgement of amounts paid to date or an award of monetary damages in favor of Acquisition.

**PARTIES**

**A.      Plaintiffs**

9.      Plaintiff Metropolitan Capital Advisors International Ltd. ("Metropolitan") is incorporated under the laws of the British Virgin Islands.  Metropolitan is a current stockholder of Acquisition, was a stockholder at the time of the misconduct complained of herein, and intends to continue to hold Acquisition stock at least through the resolution of this Action.  Metropolitan is the current beneficial owner of 229,750 shares of Acquisition stock

10.      Plaintiff Jeffrey E. Schwarz ("Schwarz" and collectively with Metropolitan "Plaintiffs") is a resident of the State of New York.  Schwarz is a current stockholder of Acquisition, was a stockholder at the time of the misconduct complained of herein, and intends to continue to hold Acquisition stock at least through the resolution of this Action.  Schwarz is the current beneficial owner of 4,750 shares of Acquisition stock.

**B.      Defendants**

11.      Nominal Defendant Navios Maritime Acquisition Corporation ("Acquisition" or the "Company") owns and operates a fleet of modern crude oil, refined petroleum product, and chemical tankers that provide world-wide marine transportation services.  Acquisition is incorporated under the laws of the Republic of the Marshall Islands and has its principal executive offices in Monte Carlo, Monaco.  Acquisition trades on the New York Stock Exchange under the ticker symbol "NNA."

12.      Defendant Navios Maritime Holdings, Inc. ("Holdings") is a world-wide maritime shipping and logistics company that focuses on the transport of dry bulk commodities, including

4

iron ore, coal, and grain.  Through its ownership of 43% of Acquisition's common stock (which equals 46.5% when adding the equity interests of Acquisition Officers and Directors that lack independence from Holdings) and certain management and administrative agreements, Holdings wholly controls the operations and management of Acquisition.  Holdings is incorporated under the laws of the Republic of the Marshall Islands and has its principal executive offices in Monte Carlo, Monaco.  Holdings trades on the New York Stock Exchange under the ticker symbol "NM."

C.      **Relevant Non-Parties**

13.      Angeliki Frangou ("Frangou") has served as the Chairman and CEO of Acquisition since its formation.  In addition, she has served as the Chairman and CEO of Holdings since August 2005, of Navios Maritime Partners L.P., a partnership controlled by Holdings, since August 2007, and of Navios Maritime Midstream Partners L.P., a partnership controlled by Acquisition, since October 2014.  Frangou has served as the Chairman of Navios South American Logistics Inc., which is majority owned by Holdings, since its inception in December 2007.  Before her involvement with Holdings, Frangou served as the Chairman, CEO and President of International Shipping Enterprises, Inc. ("International Shipping"), which acquired Holdings in 2005.  Frangou owns approximately 26.3% of the outstanding common stock of Holdings, but only 2.9% of the outstanding common stock of Acquisition.  Therefore, she is directly incentivized to favor the interests of Holdings over those of Acquisition.

14.      Anna Kalathakis ("Kalathakis") has served as a director and Senior Vice President – Legal Risk Management of Acquisition since May 2010.  Moreover, Kalathakis served as Senior Vice President – Legal Risk Management of Holdings from December 2005 until October 2012 and as Chief Legal Risk Officer of Holdings from October 2012 to the present.

15.      Ted C. Petrone ("Petrone") has served as a director of Acquisition since its inception and served as the Company's President from inception until December 2014.  Moreover,

Petrone has served as a director of Holdings since May 2007.  He has served as Navios Corporation's Vice Chairman since December 2014 and served as its President from September 2006 until December 2014.  Navios Corporation is a subsidiary of Holdings.  Overall, Petrone has spent thirty-nine years working in the maritime industry, thirty-five of which he has spent with Holdings and its affiliates.

16.    George Galatis ("Galatis") has served as a director of Acquisition since July 2010.

17.    John Koilalous ("Koilalous") has served as a director of Acquisition since June 2008, shortly before the Company's IPO.

18.    Brigitte Noury ("Noury") has served as a director of Acquisition since May 2010.

19.    Nikolaos Veraros ("Veraros") has served as a director of Acquisition since June 2008, shortly before the Company's IPO.  Veraros has worked at Investments & Finance Ltd. ("Investments & Finance") since August 2001 and is currently Senior Analyst at the firm. Investments & Finance has provided significant advisory services to Frangou and Holdings' predecessor entity.

20.    The individuals listed in ¶¶ 13-19 above are collectively referred to herein as the "Directors" or the "Board."

**JURISDICTION**

21.    This Court has jurisdiction over this Action pursuant to 28 U.S.C. § 1332 in that diversity exists between Plaintiffs and each of the Defendants and the amount in controversy exceeds $75,000, exclusive of interests and costs

22.    This Court has personal jurisdiction over each Defendant because, in Section 16 of the Loan Agreement governing the Loan, each of Acquisition and Holdings agreed that the Loan Agreement "and any non-contractual obligations connected with it shall be governed by New York law and the New York courts have exclusive jurisdiction to settle any dispute in connection with

any Finance Document," which is defined to include the Loan Agreement.  Moreover, each of Acquisition and Holdings irrevocably appointed Navios Corporation, a wholly owned subsidiary of Holdings, at its offices in New York, New York, as their agent for service of process in any proceedings before courts in New York in connection with the Loan.

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because no Defendant is a resident of the United States, but each is subject to this Court's personal jurisdiction and are engaged in activities having an effect in this District, including the issuance of Acquisition's and Holdings' publicly held shares exclusively on the New York Stock Exchange.

## SUBSTANTIVE ALLEGATIONS

### A.     Acquisition is Operationally and Effectively Controlled By Holdings

24.     Acquisition owns and operates a fleet of modern crude oil, refined petroleum product, and chemical tankers that provide world-wide marine transportation services.  It was formed as a "blank check" company by Holdings on March 14, 2008 and completed its initial public offering ("IPO") on July 1, 2008.  Immediately prior to its IPO, 100% of Acquisition was owned by Holdings and the initial officers and directors of Acquisition, including current directors Frangou, Petrone, Koilalous, and Veraros.  Although Holdings only owned 19.1% of Acquisition's outstanding common stock immediately following the IPO, it also owned a significant number of warrants, which, once they became exercisable, would dramatically increase Holdings' ownership percentage in the public company.

25.     Despite launching its IPO in 2008, the Company did not commence substantive operations until May 28, 2010, when it consummated its initial acquisition of 13 shipping vessels and options to acquire two more for a total purchase price of $457.7 million.  Due to the exercise of a large number of Holdings' warrants to purchase Acquisition shares, and other share purchases

that were spurred by these vessel acquisitions, Holdings owned 62.1% of the Company's outstanding common shares by September 1, 2010.

26.     Today, Holdings is the *de facto* controller of Acquisition.  As of March 27, 2015, the most recent date such information has been provided in the Company's SEC filings, Holdings is the beneficial owner of 43% of Acquisition's outstanding common stock.[1]  When combined with the ownership interests of the Company's officers and directors, most of which are employees of Holdings, this increases to 46.5% of the outstanding common stock.

27.     Given the realities of modern stockholder voting practices and the prevalence of absentee stockholders, Holdings and Company insiders have the clear ability to control the outcome of every matter requiring a stockholder vote, including the election of directors.  In fact, in the risk disclosure section of the Company's most recent Form 20-F, filed with the SEC on March 22, 2016, Acquisition itself acknowledges the substantial risk presented by the combined stock ownership of Holdings and certain officers and directors, stating that such ownership "permits them to influence the outcome of effectively all matters requiring approval by our shareholders at such time, including the election of directors and approval of significant corporate transactions."

28.     Moreover, Holdings fully controls the day-to-day operations of Acquisition primarily through a management agreement (the "Management Agreement").  Under the terms of the Management Agreement, Holdings, through one of its subsidiaries, provides Acquisition with

---

[1] Holdings' economic interest in Acquisition is equal to 46.6%.  Moreover, pursuant to a March 30, 2011 Exchange Agreement, Holdings exchanged 7,676,000 shares of Acquisition common stock for 1,000 shares of Series C Convertible Preferred Stock, which is convertible back into 7,676,000 common shares.  However, Holdings may only convert its preferred stock back into common shares to the extent its beneficial ownership of Acquisition's common stock would not exceed 45%.

commercial and technical ship management services.  Specifically, Holdings manages the day-to-day operations of Acquisition's vessels, supervises the maintenance and general efficiency of the vessels, purchases stores, supplies, and parts for the vessels, and arranges insurance for the vessels.

29.     In return for such services, Acquisition pays Holdings a daily fee of $6,000 per owned MR2 product tanker and chemical tanker vessel, $7,000 per owned LR1 product tanker vessel, and $9,500 per VLCC tanker vessel.  Furthermore, Acquisition reimburses Holdings for all of the actual operating costs and expenses it incurs in connection with its services under the Management Agreement.

30.     Acquisition has the right to terminate the Management Agreement only upon 120 days' notice if there is a change of control of Holdings, if Holdings breaches the Management Agreement, a receiver is appointed for all or substantially all of Holdings' property, an order is made to wind up Holdings, a final judgment or order is entered that materially and adversely affects Holdings' ability to perform its obligations under the Management Agreement, or Holdings makes a general assignment for the benefit of its creditors, files a bankruptcy or liquidation petition, or commences any reorganization proceedings.  Furthermore, Acquisition has the right to terminate the Management Agreement for any other reason upon 365 days' notice.

31.     Additionally, Acquisition and Holdings are parties to an "Administrative Services Agreement" whereby Holdings provides Acquisition with administration management services, including bookkeeping, audit and accounting services, legal and insurance services, administrative and clerical services, banking and financial services, advisory services, and client and investor relations services.  In return, Acquisition reimburses Holdings for the costs and expenses incurred in connection with the provision of these services.  The Administrative Services Agreement can be terminated by Acquisition in the same circumstances as the Management Agreement.

32.     These agreements operate to ensure that Acquisition is completely dominated by Holdings.  In fact, Acquisition does not have a single staff employee or manager of its own. Instead, it relies on the employees and officers provided by, and shared with, Holdings.  Thus, the Management Agreement and Administrative Services Agreement, in conjunction with Holdings' dominant voting power, allow Holdings to fully control the leadership, management, and operations of Acquisition.  As Acquisition's controller, Holdings owes fiduciary duties to Acquisition and its minority public stockholders.

33.     Instead of operating the Company for the benefit of all stockholders, Holdings has favored its own interests and extracted significant value from Acquisition for its own benefit.  For example, the Management Agreement and Administrative Services Agreement have resulted in enormous revenue for Holdings—for the years ended December 31, 2015, 2014, and 2013, Acquisition paid Holdings management and administrative fees of $102.9 million, $103.1 million, and $74.9 million, respectively.

34.     In other words, Acquisition is set up so that it cannot operate without Holdings, unless it hires its own operations and management team.  However, the amount it pays Holdings for those management and operational services likely exceeds what it would have to pay to have independent individuals perform those services as dedicated Acquisition employees.

35.     As becomes relevant for this case, not only is Acquisition operationally protected from a Holdings bankruptcy, but it may benefit in the long run to free itself from the Management Agreement and Holdings' iron-grip on Acquisitions' business.

36.     Unfortunately, these large fees were not enough to sufficiently ameliorate Holdings' financial difficulties and credit problems, which are explained below.  These difficulties have led Holdings to attempt to extract further value from Acquisition and abuse its position as a

controller by causing Acquisition to extend to Holdings a loan that no reasonable third party would ever extend.

**B.      Holdings' Dire Financial Condition**

37.      Whereas Acquisition is in the business of shipping liquid products across the globe, Holdings is a world-wide maritime shipping and logistics company that focuses on the transport of dry bulk commodities, including iron ore, coal, and grain.  The dry bulk shipping industry, including Holdings, has been suffering from unprecedented declines in shipping rates and what equity analysts at Wells Fargo Securities ("Wells Fargo") described in February 25 and March 11, 2016 reports as "pervasive weakness."

38.      In 2015, the dry bulk industry had both a supply and demand problem, with too many operating ships and the first year-over-year decline in seaborne iron ore, coal, and grain since 1998.  As a result, Holdings saw its adjusted EBITDA decline from $191.4 million in 2014 to $133.4 million in 2015, which resulted in Holdings generating a mere $7 million of cash from operating and investing activities.

39.      This negative market trend has continued into 2016.  For example, the Baltic Dry Index ("BDI"), which provides an assessment of the price of shipping major raw materials by sea, hit a 30-year low of 290 in February 2016, which is far below the all-time high point of 11,793 reached in May 2008.  Before this recent decline, the previous 30-year low was 513, which was reached in February 2015.  Moreover, Wells Fargo stated that it does not expect the dry bulk market to recover until 2018.  In an October 15, 2015 analyst report, J.P. Morgan Securities LLC ("JP Morgan") forecasted that dry bulk rates would decline in 2016, stabilize in 2017, but would not even reach the mid-point of an upward turn in the cycle until the end of 2019 at the earliest.

40.      The decline in the dry bulk shipping market has put enormous financial pressure on Holdings.  In Holdings' 2015 fourth quarter and full year earnings press release, dated February

23, 2016, Frangou acknowledged the difficult state of the shipping market and stated that "In light of the prolonged market weakness, we have adopted measures to reduce our cash requirements, without having to sell off assets and while honoring our obligations. We have resourcefully established cash flow needed in the medium term to sustain the company until charter rates improve."

41.     In an accompanying presentation, Holdings announced that it was suspending its dividends on both common and preferred stock in order to save $41 million annually. Frangou added that with the savings, Holdings currently only has enough liquidity to last through 2017.

42.     These market conditions and their effects on Holdings have strongly, and negatively, impacted the market performance of the company's securities. Both Holdings' stock price and bond yields demonstrate the market's belief that Holdings is in financial distress. From mid-January through February 2016, Holdings' stock regularly traded below $1.00 per share, leading to a February 16 notification from the NYSE that the company was no longer in compliance with the exchange's listing standards. Of the six analysts that have rated Holdings in 2016, three have sell ratings on the stock and three are neutral.

43.     As for Holdings' debt, JP Morgan noted that debt facilities in this industry are generally secured by first propriety mortgages on a company's vessels. Holdings is no exception. However, according to JP Morgan, "Dry Bulk asset values have fallen substantially over the past 12 months, and the decline in the market value of the company's fleet could negatively impact the company's borrowing capacity and/or result in non-compliance under restrictive covenants." In that October 2015 report, JP Morgan went on to estimate that the asset value of Holdings' vessels was only $724 million, as compared to total debt of $1.3 billion.

44.    Such an asset shortfall would make it incredibly difficult, if not impossible, for Holdings to issue any unsecured or under secured debt in independent third party transactions. Notably, when JP Morgan made that estimate of Holdings' asset value, the BDI was at 766, much higher than current levels.  Thus, the Company's ability to borrow from third parties is significantly hampered, to say the least.

45.    Holdings financial crisis is reflected by the recent trading prices of Holdings' notes. As of March 15, 2016, Holdings $350 million of unsecured notes due in 2019 traded at a yield of approximately *58%* and its $650 million of First Priority Ship Mortgage Notes due in 2022 traded at a yield of approximately *31%*.  Based on the current trading prices of Holdings' 2019 notes, an independent investor would only pay approximately $0.30 to acquire $1 of Holdings' unsecured debt.  In other words, the financial markets are saying that Holdings would have to pay an approximate 58% interest rate on an unsecured debt issuance, which means unsecured debt is unavailable to Holdings.

46.    Given Holdings' current financial situation, no independent third party would extend Holdings credit unless the loan was either (i) secured by sufficient collateral to protect the lender in the case of bankruptcy or (ii) charged an exorbitant interest rate commensurate with the enormous risk Holdings poses.  Holdings' current lenders have even required it to pledge additional collateral to support loans in recent months.  In response, Holdings, decided to abuse its control over Acquisition to cause Acquisition to extend it credit when no independent third-party would.

### C.    Acquisition Provides an Absurd Loan to Prop Up Holdings on Terms No Rational Person Could Support

47.    Given Holdings dire financial condition, it needed an immediate source of liquidity. However, no rational third party lending source would be willing to risk providing a company with

such a weak credit profile debt on mutually acceptable terms.  Unable to get financing from any rational third party lender, Holdings resorted to abusing its control over Acquisition to cause the Company to extend Holdings a loan, to the detriment of Acquisition and its public stockholders. Acquisition was able to provide this financing since the macroeconomic difficulties that are affecting the dry bulk shipping industry have not impacted Acquisition, which ships liquid products.  In fact, the so-called "wet business" that Acquisition operates in has been thriving recently.

48.     On March 9, 2016, Acquisition and Holdings entered into a loan agreement whereby Acquisition provided Holdings a revolving loan facility of up to $50 million.  The Loan bears per annum interest at a rate based on 3-month LIBOR plus 3% and it matures on December 31, 2018.

49.     Notably, the existence of the Loan was first revealed in Holdings' February 23 earnings presentation in a passing reference.  No details were provided at the time, but analysts and investors were not pleased.  According to Wells Fargo, Acquisition is viewed as the healthiest Navios company, but the "risk of importing weakness from [Holdings]" and "the related party optics are casting a shadow over [Acquisition] – both in terms of its independence and the opportunity cost associated with" providing the Loan.  One analyst on *Seeking Alpha* assumed that the Loan would have to be collateralized with Holdings' stock in Acquisition, which was worth approximately $150 million at the time.  Alternatively, instead of providing the Loan, Acquisition could have used the $40.1 million outstanding under its previously authorized $50 million share repurchase program to purchase a portion of Holdings' Acquisition stock at prevailing market rates.  This would have provided Holdings with its needed liquidity and benefited Acquisition both by loosening the iron-grip Holdings has on the Company and by avoiding the value-stripping Loan.

50.     However, when the terms of the Loan were finally revealed, they were even worse than investors feared.  The Loan favors the interests of Holdings over those of Acquisition due to its one-sided terms, which utterly ignore the tremendous credit risk that Holdings represents.  It would be an understatement to characterize the Loan as having below market terms in favor of Holdings as there is no market rate for such a loan.  No rational third party would extend this line of credit given Holdings' current financial state.

51.     Holdings' management indicated that a drawdown on the Loan would be a function of what happens to dry bulk rates going forward.  In other words, Acquisition is serving as a backstop if Holdings' current liquidity crisis is exacerbated by continued low shipping rates.  This is troubling because, as explained above, negative industry wide conditions are expected to remain in place for quite some time.

52.     Moreover, based on the recent trading prices of Holdings' notes, which are discussed above, the Loan's interest rate of LIBOR plus 3%, which currently equals approximately 3.6%, does not come close to what an independent third party lender would charge Holdings. As of March 15, 2016, Holdings $350 million of unsecured notes due in 2019 traded at a yield of approximately *58%* and its $650 million of First Priority Ship Mortgage Notes due in 2022 traded at a yield of approximately *31%*.  Thus, the financial markets believe that Holdings' unsecured debt should only be issued at a whopping 58% return, almost 55% higher than the rate provided by the Loan.  Even Holdings' secured debt ought to bear a 31% interest rate.

53.     For every dollar that Holdings draws down on the Loan, it results in an immediate loss of value to Acquisition of well more than $0.70.  This is based on the trading price of Holdings' 2019 notes, which is 30% of par, meaning an investor would pay $0.30 to acquire each $1 of debt under the 2019 notes.  A market investor in an arms'-length transaction would likely pay well less

than $0.30 on the dollar for the debt issued under the Loan since: (i) the 2019 notes and the Loan have a relatively similar amount of time to maturity; (ii) the 2019 notes are unsecured while the collateral provided in the Loan is negligible, therefore making the claim of Acquisition under the loan effectively unsecured; and (iii) the stated interest rate on the 2019 notes (8.125%) is much higher than the interest rate on the Loan (3.6%).[2]  Given Holdings' current financial profile, Acquisition would likely never be able to recover this lost value.

54.     Besides offering an interest rate completely out of line with Holdings' unsecured debt, the loan is severely under collateralized and Acquisition should have demanded collateral of sufficient value.  The Loan is secured by first priority pledges on Holdings ownership interests in Navios Europe Holdings Inc. ("NEH"), which is the holding company of Navios Europe Inc., and 8 million common units of Navios Maritime Partners L.P.  However, this collateral is of dubious and uncertain value and will not adequately compensate Acquisition for the inevitable loss of the $50 million it has agreed to extend to Holdings.

55.     Each of Holdings and Acquisition owns 47.5% of NEH.  This investment was funded by term loans provided to NEH, and thus neither entity contributed traditional equity to

---

[2] A third party investor would likely pay approximately $0.10 for every dollar issued to Holdings under the terms of the Loan.  This flows from the fact that the bulk of the value in Holdings' 2019 notes comes from the interest investors hope to receive before the time of a likely bankruptcy filing.  Assuming Holdings stays out of bankruptcy until he maturity of the Loan, the holders of the 2019 notes will receive approximately 2.5 years' worth of interest payments that would total 20.3125% of the 2019 notes' face value, which implies an expected recovery of only $0.10 per dollar for unsecured claims in a Holdings' bankruptcy.  If a similar methodology is applied to the Loan, Acquisition would receive at most 2.75 years' worth of interest, which would represent 10% of the face value of the loan due to its low interest rate.  If Holdings chooses not to draw down on the loan until much close to the time of its maturity, Acquisition will receive even less interest payments.  This means that a third-party investor would likely pay little more than $0.10 for every dollar issued to Holdings under the Loan, which represents the expected $0.10 recovery for unsecured debt in a Holdings bankruptcy plus some uncertain amount of interest that may be received from Holdings prior to a bankruptcy.

form NEH.  NEH has a very large amount of debt that has a face value well in excess of fair value.

Therefore, the value of any equity interest in NEH is likely minimal.  This is reflected by the fact

that Acquisition itself lists the carrying value of its investment in NEH, which is equal to Holdings

investment, at only $5.5 million, which likely only represents the value of Acquisition's loan to

NEH.  In fact, Wells Fargo values Holdings' and Acquisition's equity interests in NEH at zero.

56.     Wells Fargo also strongly criticized the Loan in a March 11, 2016 report, describing

the Loan as "very unfriendly for [Acquisition] shareholders," criticizing the interest rate as

providing a significantly below-market return, and valuing the associated collateral at a mere $10.5

million.  Thus, Wells Fargo estimates that the collateral is only worth 21% of the Loan.  Ultimately,

the Loan caused Wells Fargo to downgrade its rating of Acquisition from Outperform to

Underperform and moved it from being buyers to sellers of Acquisition stock, despite the fact that

it believes Acquisition had traded at a depressed valuation.

57.     Therefore, the terms of the Loan, including its miniscule interest rate, are wildly

below the market rate an independent third party would charge Holdings.  By agreeing to the terms

of the Loan, it is clear that the Board is wholly beholden to, and cannot operate independently

from, Holdings, and are completely disregarding their fiduciary duties to Acquisition and its public

stockholders.

**D.     Judicial Intervention May Save Acquisition From Losing Money to Holdings When the Loan Is Drawn**

58.     Acquisition's public disclosures to date do not report that Holdings has yet drawn

down any amounts under the Loan.  Thus, there is an opportunity to prevent the Loan's otherwise

inevitable harmful effects on Acquisition by promptly enjoining Holdings' ability to draw down

any amount thereunder.

17

59.     If Holdings is allowed to draw down on the Loan's revolving facility, Acquisition will likely never be repaid.  The Loan matures at the end of 2018, within a month and a half of when Holdings' 2019 notes come due.  Given Holdings' current financial and operational outlook, it is highly likely that the maturity of the 2019 notes will force Holdings into bankruptcy.

60.     However, Holdings and its owners are not faced with a binary choice between the Loan and bankruptcy.  There is a third option, unpleasant as it may be to Holdings: an equity raise. Instead of abusing their control over Acquisition, Holdings' equity owners, including Frangou, ought to have invested or raised new equity in order to salvage Holdings.  However, that would have required making further personal investments or conducting a dilutive offering that would have reduced the equity interests of insiders in Holdings.  Thus, Holdings turned to Acquisition and the Board did nothing to protect Acquisition's stockholders.

61.     Nonetheless, other than the potential loss of any amounts extended to Holdings under the Loan, Acquisition does not need to fear a bankruptcy of Holdings.  Such an event would not materially affect the Company's operations.  The services Holdings provides to Acquisition can easily be outsourced to other third parties experienced in the maritime industry and, since Acquisition claims the rates charged by Holdings are competitive with independent vessel management companies, retaining a new manager ought not to result in materially increased costs and likely would result in savings for Acquisition.

62.     For example, under the Management Agreement, Acquisition pays Holdings $9,500 per day, excluding dry docking costs, to operate its VLCC vessels, which are more commonly known as supertankers.  In comparison, Euronav, which is one of Acquisition's competitors, stated in a recent presentation that its daily operating expenses for a VLCC equaled $8,165.

63.    Furthermore, Acquisition should have no difficulty obtaining any requisite consents from lenders to change managers as no true third party lender would prefer to have a conflicted and failing Holdings manage the Company's operations as opposed to an experienced, financially healthy, and independent third-party manager.

## FIDUCIARY DUTIES OF HOLDINGS AND THE ACQUISITION DIRECTORS

64.    Pursuant to the Marshall Islands Business Corporations Act, the Republic of the Marshall Islands has adopted Delaware corporation law (and the law of other U.S. states with substantially similar provisions), both with respect to statutory provisions and with respect to non-statutory law, insofar as the non-statutory law of Delaware and the U.S. does not conflict with other provisions of the Business Corporations Act.  52 MIRC § 13; *See Metcalf v. Zoullas*, C.A. No. Civ. 3996, 2012 WL 169874 at *3, (Jan. 19, 2012) ("Marshall Islands law… look[s] to Delaware corporate law.").

65.    To the extent the Loan forum selection provision set forth in paragraph 21 above, stating that New York law would apply to any "non-contractual" obligations arising from the Loan, means that New York law would govern the fiduciary duties of the Directors and of Holdings itself, there is no pertinent distinction between Delaware and New York law as applied to these facts.

66.    Like the common law of fiduciary duties under Delaware and New York law, the Marshall Islands Business Corporations Act expressly provides a standard of care that all corporate directors must meet.  Specifically, the Business Corporations Act notes that "[d]irectors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions."  52 MIRC § 61.

67.     By reason of their positions as officers, directors, and/or fiduciaries of Acquisition and because of their ability to control the business and corporate affairs of Acquisition, the Directors owe fiduciary duties to Acquisition and its stockholders, including the duties of care, loyalty, and good faith, and were required to use their utmost ability to control and manage Acquisition in a fair, just, honest, and equitable manner.  Each director of the Company owes to Acquisition and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

68.     The Directors, because of their positions of control and authority as directors and/or officers of Acquisition, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Acquisition, which is owned in large part by Holdings, and the significant overlap between the Acquisitions and Holdings' directors and senior management, the Directors had knowledge of material non-public information regarding Holdings' financial situation.

69.     To discharge their duties, the Directors were required to exercise reasonable and prudent supervision over the business affairs of the Company.  By virtue of such duties, the Directors were required to, among other things, exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business.  The Directors were also required to place Acquisition's interests ahead of the interests of Holdings or their own personal financial interests.

70.     Moreover, Holdings, as a controlling stockholder, owed fiduciary duties to Acquisition.  Pursuant to Delaware law, a stockholder is controlling "if it owns a majority interest

in or exercises control over the business affairs of the corporation." *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994).

71.     As of December 31, 2015, Holdings had a 46.6% economic interest in Acquisition. Holdings controls the day-to-day operations of Acquisition through the Management Agreement and the Administration Services Agreement.  Indeed, because Holdings operates Acquisition's daily operations, Acquisition does not employ any staff employees or managers of its own, but rather relies on staff and officers provided by, and shared with, Holdings.  There is also significant overlap between the Board and senior management of Acquisition and Holdings, including Frangou (Chairman and CEO of both Acquisition and Holdings), Kalathakis (director of Acquisition and Chief Legal Risk Officer of Holdings) and Petrone (director of Acquisition and Holdings).  Moreover, Veraros has longstanding ties to Frangou and Holdings through his position at Investments & Finance.

72.     By virtue of its economic interest and its control of Acquisition, Holdings exercised control over Acquisition's business and affairs.  Due to its position of control, Holdings owed duties of loyalty, due care, and good faith to Acquisition.  Rather than discharge its duties in good faith, Holdings took advantage of its position of control to force Acquisition into approving the Loan, on terms clearly unfavorable to Acquisition.

## DERIVATIVE ACTION ALLEGATIONS

73.     Plaintiffs bring this Action derivatively to redress injuries suffered by the Company as a direct result of the breaches of fiduciary duty by Holdings.

74.     Plaintiffs currently own Acquisition common stock and have owned Acquisition Common Stock during all relevant times.

75.     Plaintiffs will retain their respective shares in the Company throughout the duration of this litigation.

76.     Plaintiffs will adequately and fairly represent the interests of Acquisition and its public stockholders in enforcing and prosecuting its rights and have retained counsel competent and experienced in stockholder derivative litigation.

77.     The wrongful acts complained of herein subject, and will persist in subjecting, the Company to continuing harm because Holdings may invoke its right to borrow funds pursuant to the Loan at any time.

## DEMAND IS EXCUSED AS FUTILE

78.     Plaintiffs have not made a demand on the Board to institute this action against Holdings.  Such demand would have been futile as the Board is incapable of making an independent and disinterested decision to investigate the allegations contained herein and to institute and vigorously prosecute this Action.

79.     At the time this Action was initiated, Acquisition's Board was comprised of seven directors: Frangou, Kalathakis, Petrone, Galatis, Koilous, Noury, and Veraros.  Demand is excused as futile because a majority of these directors either (i) engaged in conduct that is not a legitimate exercise of business judgment; and/or (ii) lack independence from Holdings, the sole beneficiary of the misconduct alleged herein.

**A.     Demand is Excused Because the Directors' Conduct is Not a Valid Exercise of Business Judgment**

80.     Each of the Company's seven directors was on the Board when it approved the Loan and presumably each director voted to approve the Loan.  As explained above, no rational person would agree to provide such a loan to Holdings given its current financial state.  The Directors acquiescence to the loan is so unreasonable under the circumstances to support an inference that they are acting disloyally and in bad faith.

81.     The Loan bears a minuscule interest rate of three month LIBOR plus 3%.  That currently equates to approximately 3.6%.  That miniscule rate of interest is a pittance compared with the 31% and 58%, the market currently demands for Holdings' secured and unsecured debt, respectively.  Moreover, as explained in more detail above, since a market investor would pay a mere $0.30 to acquire $1 worth of Holdings' 2019 notes, for every dollar that Holdings draws down on the Loan, it results in an immediate decline in the fair value of Acquisition's assets of well over $0.70 that likely will never be recovered.

82.     The Loan is also severely under collateralized, with Wells Fargo estimating the offered collateral to be worth a mere 21% of the $50 million available to Holdings under the revolving facility.

83.     Finally, in light of the difficult operating conditions at Holdings and the fact that maturity date on the Loan is within the bankruptcy preference period should Holdings be unable to repay its 2019 notes, it is unlikely that Acquisition will be able to recover any of the $50 million if Holdings draws down on the Loan.

84.     Given these practical market realities, it is unconscionable that the Directors agreed to extend credit to Holdings at an interest rate of LIBOR plus 3%.  Thus, the Loan is so outrageous, its issuance cannot be the product of a valid exercise of business judgment.  The provision of such a Loan demonstrates that each Director is wholly beholden to, and incapable of exercising judgment independently from Holdings.

85.     Moreover, while Holdings could not access the public debt markets, it could have raised new equity, either from its existing owners or from new third parties.  Of course, such an equity raise would either cost current Holdings shareholders, including Frangou, a significant amount of money or would significantly dilute their current ownership.  However, Frangou and

Holdings' other owners choose to exploit their control over Acquisition instead of reaching into their own pockets.

86.      By agreeing to the Loan instead of forcing Holdings to raise new equity, each director breached his or her fiduciary duties to Acquisition and its public stockholders.  Although the Directors are not named herein as defendants, each still faces a substantial likelihood of liability for their conduct as described herein.

87.      Therefore, demand is excused as futile

**B.      Demand is Excused Because a Majority of the Board is Not Otherwise Independent from Holdings**

88.      As noted above, Holdings is the direct and sole beneficiary of the Loan.  Therefore, any director who lacks independence from Holdings cannot impartially consider a demand to institute litigation that asserts the claims raised herein.   In addition to showing their lack of independence simply by agreeing to such an absurd related party transaction, a majority of the Board also lacks independence from Holdings for separate reasons.

89.      Three directors, Frangou, Kalathakis, and Petrone owe fiduciary duties to both Acquisition and Holdings as either officers of directors, and are therefore plainly conflicted from assessing a demand to unwind, rescind, or enjoin effectiveness of the Loan.

> a.   Frangou, in addition to serving as Chairman as CEO of Acquisition, has also served as the Chairman and CEO of Holdings since August 2005. In addition, she has served as the Chairman and CEO of Navios Maritime Partners L.P., a partnership controlled by Holdings, since August 2007 and as the Chairman of Navios South American Logistics Inc., which has been majority owned by Holdings since its inception in December 2007.  Moreover, Frangou owns approximately 26.3% of

the outstanding common stock of Holdings, but only 2.9% of the outstanding common stock of Acquisition.

b. Kalathakis, in addition to serving a director and Senior Vice President – Legal Risk Management of Acquisition, has also served as the Chief Legal Risk Officer of Holdings since November 2012.  Prior to that, from December 2005 until October 2012, Kalathakis was Holdings' Senior Vice President – Legal Risk Management.

c. Petrone, in addition to serving as a director of Acquisition, has served as a director of Holdings since May 2007 and as the Vice Chairman of Navios Corporation, a subsidiary of Holdings, since December 2014.  Petrone also served as the President of Acquisition from its inception until December 2014, as the President of Navios Corporation from September 2006 until December 2014 and has spent thirty-five out of his thirty-nine year career in the maritime industry with Holdings.

90.    As fiduciaries of Holdings, Frangou, Kalathakis, and Petrone are patently not independent and cannot impartially evaluate a demand concerning the matters alleged herein.

91.    Moreover, Veraros appears to have longstanding business ties to Frangou and Holdings.  Veraros has worked at Investments & Finance since August 2001 and is currently its Senior Analyst.  Before she came to lead Holdings, Frangou was the Chairman and CEO of International Shipping.  On March 1, 2005, International Shipping and Holdings announced that they had reached an agreement whereby International Shipping would acquire Holdings for over $600 million and rename itself Holdings.  Frangou was so committed to the acquisition of Holdings that she announced that she would acquire Holdings personally if International Shipping's

stockholders did not vote in favor of the deal.[3] Critically, Investments & Finance served as one of International Shipping's lead advisors on this deal. Thus, Frangou and Veraros likely developed a relationship, if one did not exist before, which led Frangou to arrange for Veraros's appointment to the Acquisition Board.

92.    Additionally, both Veraros and Koilalous joined the Acquisition Board before the IPO in July 2008 when Holdings still owned 100% of the Company. Thus, Holdings had the sole power to make these appointments. At the time, Holdings also sold units of the Company, each consisting of one share of common stock and one warrant to purchase one share of common stock, to each of Veraros and Koilalous (along with Frangou and Petrone who were also on the initial Board) at an absurdly low price of $0.0029 per unit. Koilalous received 15,000 units at an aggregate purchase price of $43.50 and Veraros received 10,000 units at an aggregate purchase price of $29.00.

93.    Moreover, Galatis and Noury were added to the Board in July and May 2010 respectively, at a time when Holdings dominated the Board and owned warrants to purchase shares that would give Holdings majority control once they became exercisable and were exercised. Thus, each of Koilalous, Veraros, Galatis, and Noury owe their positions as directors to Holdings and are beholden to Holdings. As a result, a majority of the Board lacks independence from Holdings and cannot impartially consider a demand regarding the matters alleged herein. Therefore, Demand is excused as futile.

## COUNT I

### For an Injunction Against Holdings Drawing Down on the Loan

---

[3] This commitment proved to be unnecessary as International Shipping's stockholders approved the deal in August 2005.

94.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

95.     As explained above, the Loan was entered into as a result of the breaches of fiduciary duty on the part of Holdings and the Directors.  Therefore, the Loan is invalid and unenforceable.

96.     In all likelihood, the Loan will either never be repaid or any amounts that are repaid will be clawed back in a bankruptcy proceeding.  It is critical that Holdings be enjoined from drawing down any amounts under the Loan's $50 million revolving facility as any draw down will cause irreparable harm to Acquisiton.

97.     Thus, this count is brought solely against Holdings and seeks an injunction that prevents Holdings from making any drawdowns under the Loan in any amount.

98.     Plaintiffs have no adequate remedy at law.

## COUNT II

### Breach of Fiduciary Duty Against Holdings

99.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

100.    Holdings owes fiduciary duties to Acquisition's public stockholders because it has the power to, and in fact does, exercise control over Acquisition and its operations.

101.    Holdings has breached its fiduciary duties to Acquisition's public stockholders, including its duty of loyalty, by elevating and favoring its own interests over the interests of Acquisition and its public stockholders, including by causing the Company to provide the Loan.

102.    The Loan is unfair to Acquisition as no rational third party would extend Holdings such a loan given its poor credit profile and high risk of bankruptcy.

103.    As a result of these actions, Acquisition has been, and will be, damaged.

104.    This count seeks the payment of monetary damages to the extent Acquisition has issued any funds under the Loan to Holdings that have not been rescinded or paid back.

## COUNT III

### Aiding and Abetting Breaches of Fiduciary Duty Against Holdings

105.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

106.    Solely to the extent Holdings is not deemed to be a controlling stockholder of the company, it is named herein as an aider and abettor of the breaches of fiduciary duty on the part of the Directors.

107.    The members of the Board, as directors of Acquisition, are fiduciaries of the Company and its stockholders.  As such, they owe the Company the highest duties of good faith, fair dealing, due care, and loyalty.

108.    The Directors have breached their fiduciary duties, including the duty of loyalty, by elevating and favoring Holdings' interests over the interests of Acquisition and its public stockholders, including by causing the Company to provide the Loan.

109.    The Loan is unfair to Acquisition as no rational third party would extend Holdings such a loan given its poor credit profile and high risk of bankruptcy.

110.    Holdings was aware of the Directors fiduciary duties to manage Acquisition for the benefit of the Company and its public stockholders.  By favoring the interests of Holdings over those of the Company and its public stockholders, the Directors have breached their fiduciary duties.

111.    Holdings had knowledge of such breaches of fiduciary duty and knowingly participated in the breaches by causing the Company to extend the Loan.

28

112.    The Loan is unfair to Acquisition as no rational third party would extend Holdings such a loan given its poor credit profile and high risk of bankruptcy.

113.    As a result of these actions, Acquisition has been, and will be, damaged.

114.    This count seeks the payment of monetary damages to the extent Acquisition has issued any funds under the Loan to Holdings that have not been rescinded or paid back.

## COUNT IV

### Waste of Corporate Assets Against Holdings

115.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

116.    Holdings had a fiduciary duty to exercise good faith and diligence in the administration of the affairs of Acquisition and in the use and preservation of its property and assets.  Holdings breached these duties by diverting corporate assets for improper and unnecessary purposes by providing Holdings with the Loan, which no rational third party would agree too.

117.    The Loan is designed solely to benefit Holdings, to the detriment of Acquisition. Any benefits received by the Company cannot reasonably be viewed as a fair exchange for corporate assets and monies expended by Acquisition.  Thus, by agreeing to the Loan, and to the extent any amounts have been drawn down against the $50 million facility, Holdings has wasted assets of Acquisition.

118.    As a result of these actions, Acquisition has been, and will be, damaged.

119.    This count seeks the payment of monetary damages to the extent Acquisition has issued any funds under the Loan to Holdings that have not been rescinded or paid back.

## COUNT V

### Unjust Enrichment Against Holdings

120.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

121.     As explained above, no rational third party would agree to extend Holdings the Loan. To the extent any amounts have been drawn down against the $50 million facility, Holdings was unjustly enriched as a result of the Loan at the expense of Acquisition and its public stockholders.

122.     As a result of the actions of Holdings, Acquisition has been and will be damaged.

123.     This count seeks the payment of monetary damages to the extent Acquisition has issued any funds under the Loan to Holdings that have not been rescinded or paid back.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

a.   Declaring that this action is a proper derivative action, that Plaintiffs are appropriate representative plaintiffs to pursue Acquisition's claims against Holdings, and that Demand is excused as futile;

b.   Declaring that Holdings breached its fiduciary duties as Acquisition's controlling stockholder;

c.   Declaring that the Holdings aided and abetted the Directors' breaches of fiduciary duty;

d.   Declaring that the Loan is void;

e.   Enjoining the payment of any funds by Acquisition to Holdings pursuant to the Loan;

f.   Rescinding any payments made by Acquisition to Holdings pursuant to the Loan;

g.   Imposing a constructive trust, for the benefit of Acquisition, on any payments made by Acquisition to Holdings pursuant to the Loan;

h.   Requiring Holdings to compensate Acquisition for the damage it has and will suffer as a result of its actions;

i.   Awarding Plaintiffs the costs and disbursements of this action, including but not limited to

attorneys' fees and expenses; and

j.   Granting such other and further relief as the Court deems just and proper.


DATED: April 1, 2016

BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP


/s/    *Mark Lebovitch*
Mark Lebovitch
John Vielandi
Alla Zayenchik
1251 Avenue of the Americas
New York, NY 10020
Tele: (212) 554-1400
Fax: (212) 554-1444
MarkL@blbglaw.com
John.Vielandi@blbglaw.com
Alla.Zayenchik@blbglaw.com

*Attorneys for Plaintiffs*

## VERIFICATION

STATE OF NEW YORK:

                SS.

COUNTY OF NEW YORK:

Jeffrey E. Schwarz, individually and as CEO of Metropolitan Capital III Inc., the general partner of Metropolitan Capital III LP, the investment manager of Metropolitan Capital Advisors International Ltd. ("MCAIL") hereby declare and verify that both I and MCAIL are currently owners of Navios Maritime Acquisition Corporation (the "Company") stock and have continuously been owners of the Company's stock at all relevant times. I have reviewed the allegations in the Verified Stockholder Derivative Complaint and certify that such allegations are true to the best of my knowledge. I confirm that neither I nor MCAIL are acting collusively, and we are capable of and willing to fairly and adequately represent the interest of the stockholders who are similarly situated in the enforcing the rights of the Company.

I declare under penalty of perjury that the forgoing is true and correct.

Executed this 31st day of March, 2016 at New York, NY

Sworn and subscribed to before me this 31 day of March, 2016

Notary Public

**CAROLYN CASTIGLIA**
**NOTARY PUBLIC-STATE OF NEW YORK**
**No. 01CA6300698**
**Qualified in Kings County**
**My Commission Expires April 07, 2018**

By: _____

Jeffery E. Schwarz, Individually

**METROPOLITAN CAPITAL ADVISORS INTERNATIONAL LTD.**

**By: Metropolitan Capital III, LP, Its Investment Manager**

**By: Metropolitan Capital III Inc., Its General Partner**

By: _____

Jeffery E. Schwarz, CEO